IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| **JAMES EARL COLLINS,** | |
| Plaintiff, | |
| v. | CASE NO. CV-07-_____ |
| | 2:07cv972-WKW |
| **UNITED PARCEL SERVICE, INC.,** | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

## COMPLAINT AND JURY DEMAND

### I. PRELIMINARY STATEMENT

1. This is an action for age discrimination under the Age Discrimination in Employment Act of 1967 (ADEA), *as amended*, 29 U.S.C. § 621, *et seq.*, under the Alabama Age Discrimination in Employment Act (AADEA) of 1997, *Code of Alabama*, § 25-1-20, *et seq.*, and to redress the harms suffered in violation of state law.

### II. JURISDICTION

2. Jurisdiction over the federal claims is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(4) and 29 U.S.C. §§ 626(b) and (c)(1). In addition, the jurisdiction of this Court is pursuant to 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act). Jurisdiction over claims based on Alabama law exists under the doctrine of Supplemental Jurisdiction. 28 U.S.C. § 1367.

1

### III. VENUE

3. All acts complained of herein relate to Plaintiff's place of employment within the Middle District of Alabama and venue is proper in the Middle District of Alabama. 28 U.S.C. § 1391.

### IV. PARTIES

4. Plaintiff is a citizen of the United States and at all times related to this action, was over 40 years of age. Plaintiff is a resident of Eclectic in Elmore County, Alabama.

5. Defendant United Parcel Service, Inc. ("UPS"), is a global corporation with its corporate headquarters located in Atlanta, Georgia.

6. Defendant is principally engaged in package delivery services and a provider of specialized transportation and logistics services.

7. At all times relevant to the allegations in this Complaint, Defendant United Parcel Service, Inc. was doing business at various cities in the State of Alabama, including within the Middle District of Alabama.

8. At all times relevant to this Complaint, Plaintiff was assigned to work at Defendant's facilities in Anniston, Opelika and Montgomery, within the Middle District of Alabama.

9. At all relevant times, Defendant employed more than 20 people and constitutes an employer within the meaning of 29 U.S.C. § 630(b) and Code of Alabama, § 25-1-20(2).

### V. PROCEDURAL REQUIREMENTS

10. On or about October 6, 2006, Plaintiff filed a charge of discrimination against Defendant in the Birmingham, Alabama, office of the Equal Employment Opportunity Commission ("EEOC").

11. Plaintiff received a Right-to-Sue Letter dated August 1, 2007, and fewer than ninety days have elapsed since Plaintiff received same.

## VI. FACTS

12. Plaintiff was born on May 28, 1951, and was 54 years of age at the time he was unlawfully demoted to the position of on car supervisor.

13. Plaintiff has worked for Defendant for over 35 years.

14. Throughout his employment with Defendant, Plaintiff has performed his duties in a satisfactory manner.

15. Plaintiff has received satisfactory annual evaluations.

16. Plaintiff has been an extremely loyal employee throughout his employment.

17. From 1985 until May 22, 2006, Plaintiff held the position of Business Manager and was assigned to Defendant's Anniston, Opelika and Montgomery facilities.

18. As Business Manager, Plaintiff was responsible for the entire operations at each facility, including but not limited to the loading of trucks, supervising drivers, and the pick up and delivery of packages from said locations.

19. On April 20, 2006, Plaintiff attended the UPS Central Division meeting in Birmingham. While there, Plaintiff met Al Breden, the new District Manager for Alabama.

20. Shortly after his introduction to Breden, Breden commented that Plaintiff would be eligible to retire soon.

21. Plaintiff had never mentioned retirement to Breden or any other UPS employee.

22. On April 26, 2006, Breden visited the Opelika facility to interact with employees and customers in that area.

23. Plaintiff was working at the Opelika facility that day and was expecting Breden's visit.

24. While walking to the front of the Opelika facility that day, Plaintiff noticed an unoccupied tractor with the engine running.

25. Plaintiff immediately took steps to find out who had left the tractor running and unattended.

26. Plaintiff located Matt Underwood, a part-time supervisor under the age of forty, and determined that he was responsible for the infraction.

27. As a part-time supervisor, Underwood is familiar with relevant UPS policies.

28. There were a number of hourly employees working at the Opelika facility who had been properly trained and who were responsible for driving company vehicles on the property.

29. Underwood knew that he had not been trained and should not be driving vehicles at the facility.

30. Underwood also knew that given his lack of training and the availability of hourly employees, there was no reason for him to be driving company vehicles on the property.

31. Plaintiff explained to Underwood that he could not leave a tractor unattended with the engine running.

32. Plaintiff also advised Underwood that if he believed that he needed additional training, Defendant had previously allowed employees to practice with a vehicle on Saturdays while there is less traffic and fewer distractions.

33. Underwood indicated that he understood Plaintiff's explanations.

34. During Plaintiff's reprimand to Underwood, Plaintiff observed that Breden had arrived at the facility.

35. Plaintiff greeted Breden and accompanied him as he walked around the facility. Plaintiff was also present as Breden spoke to employees working on preload, introduced himself to drivers, and conducted the pre-communication meeting.

36. After the pre-communication meeting, Plaintiff accompanied Breden back to his car.

37. At this time, Breden casually commented to Plaintiff that Underwood needed to be trained.

38. Plaintiff told Breden that Underwood would receive additional training.

39. Breden then told Plaintiff that he wanted to speak with him further because Plaintiff needed "to plan for the future".

40. Breden asked Plaintiff if he had a financial planner and stated that if Plaintiff worked a day past the time he was eligible to retire, it would cost Plaintiff money.

41. Breden also stated that Plaintiff needed to speak with Stephanie Burks, the comptroller in Defendant's Birmingham District Office, about retirement options.

42. Plaintiff did not contact Burks about retirement because he was not interested nor had any intentions of retiring at any time in the near future.

43. However, a couple of days following Breden's visit to the Opelika facility, Burks called Plaintiff.

44. Burks told Plaintiff that Breden had instructed her to review the retirement package with him.

45. Burks also told Plaintiff that she would be in Opelika soon and that she would discuss retirement plans further with him at that time.

46. Burks also gave Plaintiff information about a website to visit that would provide him with retirement benefits and options.

47. Shortly thereafter, Stan Garrett, the Central Division Manager and Plaintiff's immediate supervisor, also asked Plaintiff about his retirement plans during a visit to the Opelika facility.

48. Although Defendant had provided him with unsolicited retirement information, Plaintiff still had no intentions of retiring because he valued the benefits of his position.

49. Defendant routinely awards bonuses and stock options at the end of each calendar year to employees in supervisory and managerial positions.

50. Had Plaintiff retired prior to December 2006, he would have forfeited his yearly bonus, stock options, and six weeks of accrued vacation and personal days.

51. Plaintiff has received a yearly bonus, equivalent to one-half of his monthly salary, every year that he has been in management.

52. Further, Plaintiff has been recommended to the Management Incentive Program (MIP) every year that he has been in management.

53. The MIP awards shares of stock to managers and supervisors which vary each year by units. For example in 2007, as a supervisor, Plaintiff will receive shares equivalent to 1.8 multiplied by his monthly salary. Managers will receive double this amount, or shares equivalent to 3.6 multiplied by their respective monthly salary.

54. In 2006, Plaintiff received shares equivalent to 1.6 multiplied by his monthly salary. Had Plaintiff not been unlawfully demoted in May 2006, he would have received shares equivalent to 3.2 multiplied by his monthly salary.

55. These stock options, bonuses, and accrued vacation and personal days were very important to Plaintiff.

56. After Breden's visit on April 26, 2006, Plaintiff immediately took the steps necessary to ensure that Underwood would receive the training he needed.

57. Plaintiff contacted Dwight Barron in the Montgomery Feeder Department and asked that he send Plaintiff a training packet for shifters.

58. Shifters are employees that are responsible for moving vehicles at UPS facilities. In light of Plaintiff's observations on April 26th, he believed that Underwood needed shifter training.

59. Plaintiff told Underwood that he would receive formal training and that he need not come in on Saturday to practice with the company vehicles.

60. On or about May 4, 2006, Plaintiff received the shifter training packet and began making preparations for Underwood to receive formal training from Marshall Norrell.

61. Marshall Norrell is an employee at the Opelika facility who is feeder qualified and trains other employees in the driving and moving of vehicles. Norrell has been employed with UPS for over 20 years.

62. Plaintiff was scheduled to be on vacation from May 15, 2006 through May 27, 2006. However, because Plaintiff knew that the Opelika facility was shorthanded, Plaintiff planned to return to work on May 22, 2006.

63. When on vacation, it is customary for a manager to assign another experienced employee to assume managerial duties in his absence.

64. Plaintiff assigned Norrell to assume his managerial duties while he was on vacation.

65. Because of this assignment, it was logistically impossible for Norrell to train Underwood and perform all other required managerial duties.

66. As such, Plaintiff scheduled Underwood's training to begin once he returned from vacation.

67. After Plaintiff had made these training preparations, Breden instructed all managers to re-train inside employees on the proper procedures for moving equipment on a safety conference call.

68. On May 18, 2006, while Plaintiff was on vacation, Underwood had an accident while moving a trailer.

69. Underwood called Plaintiff at his home and reported that he had scratched a trailer.

70. Plaintiff informed Underwood that this incident had to be reported and instructed Underwood to have Norrell call it in to the District office.

71. On Saturday, May 20, 2006, Plaintiff attended a Management Report Back meeting in Evergreen, Alabama.

72. Plaintiff customarily attended Management Report Back meetings even if he was on vacation. Because of this practice, Plaintiff's colleagues would never know that he was on vacation unless he told them.

73. Plaintiff commuted to Evergreen with three other UPS employees.

74. While at this meeting, Breden stated that he was surprised Plaintiff was attending the meeting.

75. Since Breden was new to the District, Plaintiff explained to Breden that he had always attended the report back meetings, even if he was on vacation.

76. Several other staff managers also commented they were surprised to see Plaintiff at the meeting.

77. Plaintiff was surprised by their comments because he had always attended the report back meetings.

78. Plaintiff began to feel uneasy because from these comments, he knew that he had been a topic of discussion.

79. While traveling back from the report back meeting, Garrett contacted Plaintiff on his cell phone and asked whether he was planning on returning to work on Monday, May 22, 2006.

80. Plaintiff told Garrett that he had planned on returning early because he knew that the Opelika facility was shorthanded.

81. Garrett then informed Plaintiff that since he was already planning to return to work on May 22nd, that he needed to report to the District office in Birmingham instead.

82. Plaintiff was concerned and had no idea as to why he needed to report to the district office.

83. At approximately 10:00 am on May 22, 2006, Plaintiff arrived at the District office and contacted Garrett to find out where he should report.

84. Garrett told Plaintiff to report to his office.

85. After waiting for some time, Plaintiff again contacted Garrett. Garrett told Plaintiff to report to Charlene Thomas' office at 1:30 p.m.

86. Charlene Thomas is employed as the Operations Manager with Defendant.

87. When Plaintiff arrived at Thomas' office, also present were Danny Wong, Human Resources Manager and Garrett.

88. Thomas began asking Plaintiff about Matt Underwood's accident on May 18th.

89. Since he was on vacation, Plaintiff explained to Thomas his understanding regarding the accident. Plaintiff also explained his previous conversations with Underwood regarding training, the steps he had taken to secure training for Underwood and his prior conversation with Breden.

90. After Plaintiff's explanations, Thomas stated that they needed to discuss the matter and would meet with Plaintiff again. Plaintiff was asked to wait in Garrett's office.

91. Plaintiff waited in Garrett's office for several hours.

92. Garrett returned and did some work while Plaintiff sat and waited. Thomas later came in and informed Garrett that she needed to speak with him.

93. At approximately 5:15 p.m., Plaintiff was told to report back to Thomas' office.

94. When Plaintiff arrived, Wong told him that he was being demoted because he did not specifically tell Underwood not to drive the tractor.

95. Wong instructed Plaintiff to report to Montgomery as an on car supervisor and that his salary would be reduced. Wong informed Plaintiff that someone would let him know the specific amount of the salary reduction.

96. An on-car supervisor is responsible for training drivers at a specific location.

97. Plaintiff was replaced by Anthony Knuckles, an employee substantially younger than him and outside the protected class.

98. Plaintiff's new manager was Luis Ponce. At the time of his demotion, Ponce was substantially younger than Plaintiff.

99. Plaintiff's gross pay was reduced by $ 555.00 per month.

100. Plaintiff's retirement pay is based upon his annual salary during the last five (5) years of his employment.

101. As such, Plaintiff's retirement income has been drastically impacted as a result of his unlawful demotion and reduction in salary.

102. Plaintiff believes that the real reason for his demotion and reduction in salary was because of his refusal to give in to pressure by his supervisors to retire.

103. Because Plaintiff was not yet willing to retire, he was singled out and punished.

104. Other persons outside of Plaintiff's protected category have not suffered adverse employment actions for similar or more egregious infractions.

105. For example, on June 1, 2006, Zachary Nabors, a non-supervisory employee assigned to the Gadsden facility had an accident similar to that of Underwood.

106. At the time of the June 1st accident, Nabors' supervisor was Barry Tolbert, another Business Manager with the company.

107. Tolbert was familiar with relevant UPS policies.

108. Tolbert was not demoted or otherwise disciplined for Nabors' accident.

109. Plaintiff had been discriminated against by Defendant in the terms and conditions of his employment, and by the decision to demote him because of his age.

110. Upon information and belief, Defendant has a pattern and practice of unlawfully finding ways to terminate, demote or otherwise coerce older employees to retire.

## COUNT I: AGE DISCRIMINATION IN VIOLATION OF THE ADEA

111. Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

112. Plaintiff's age was a motivating factor and made a difference in the decisions by Defendant to demote Plaintiff from Business Manager to on car Manager.

113. Defendant knowingly and willfully discriminated against Plaintiff on the basis of his age in violation of the ADEA.

## COUNT II: AGE DISCRIMINATION IN VIOLATION OF THE AADEA

114.    Plaintiff adopts and realleges the above paragraphs as if fully set out herein.

115.    Plaintiff's age was a motivating factor and made a difference in the decisions by Defendant to demote Plaintiff from Business Manager to on car manager.

116.    Defendant knowingly and willfully discriminated against Plaintiff on the basis of his age in violation of the AADEA.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(a)   declaring that the acts and practices complained of herein are in violation of the ADEA and the AADEA;

(b)   enjoining and permanently restraining these violations of the ADEA and the AADEA;

(c)   directing Defendant to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

(d)   directing Defendant to place Plaintiff in the position he would have occupied but for Defendant's discriminatory treatment and making him whole for all earnings he would have received but for Defendant's discriminatory treatment, including but not limited to, wages, pension, stock options and other lost benefits;

(e) directing Defendant to pay Plaintiff an additional amount as liquidated damages as provided for in Section 7(b) of the ADEA, 29 U.S.C. § 626(b), and other applicable statutes;

(f) awarding Plaintiff the costs of this action together with reasonable attorneys' fees, as provided by Section 7(b) of the ADEA, 29 U.S.C. § 626(b);

(g) awarding Plaintiff compensatory and punitive damages under the AADEA and other state law claims; and

(h) granting such other and further relief as this Court deems necessary and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted this 29th day of October, 2007.

*Marcia Woodham*
MARICIA WOODHAM (BEN050)
Attorney for Plaintiff

**OF COUNSEL:**

**Sabel & Sabel, P.C.**
Hillwood Office Center
2800 Zelda Rd. Suite 100-5
Montgomery, Ala. 36106
Telephone:    (334) 271-2770
Fascimile:    (334) 277-2882

## **CERTIFICATE OF SERVICE**

I do hereby certify that a copy of the foregoing Complaint has been served upon the following:

UNITED PARCEL SERVICE, INC.
c/o CSC LAWYERS INCORPORATING SVC INC
150 SOUTH PERRY STREET
MONTGOMERY, AL  36104

by delivering same to the United States District Court Clerk's office, with instructions to mail,

via certified mail, first class postage provided and prepaid and properly addressed on this the

29th day of October, 2007.

*Marcia Woodham*
MARICIA WOODHAM

DUPLICATE

Court Name: U S DISTRICT COURT - AL/M
Division: 2
Receipt Number: 4602000996
Cashier ID: brobinso
Transaction Date: 10/30/2007
Payer Name: SABEL AND SABEL

CIVIL FILING FEE
 For: SABEL AND SABEL
 Case/Party: D-ALM-2-07-CV-000972-001
 Amount:         $350.00

CHECK
 Check/Money Order Num: 9299
 Amt Tendered: $350.00

Total Due:       $350.00
Total Tendered:  $350.00
Change Amt:      $0.00

COLLINS V. UPS INC